**Philippe BEY and Michel Jung, Appellants,**

v.

**Janos KOLLONITSCH and Arthur A. Patchett, Appellees.**

**Appeal No. 86–809.**

United States Court of Appeals, Federal Circuit.

Nov. 28, 1986.

Frederick F. Calvetti, Stevens, Davis, Miller & Mosher, of Alexandria, Va., argued for appellant. With him on the brief was Albert Tockman. Also on the brief was Gary Street and Raymond A. McDonald, Merrell Dow Pharmaceuticals, Inc., Cincinatti, Ohio.

Hesna J. Pfeiffer, Merck & Co., Inc., of Rahway, N.J., argued for appellees. With him on the brief was Charles M. Caruso.

Before MARKEY, Chief Judge, and SMITH and ARCHER, Circuit Judges.

EDWARD S. SMITH, Circuit Judge.

The final decision of the Patent and Trademark Office (PTO) Board of Patent Appeals and Interferences (board), Interference No. 100,988, awarding priority of invention to Janos Kollonitsch and Arthur A. Patchett (Kollonitsch) over Philippe Bey and Michel Jung (Bey), is reversed.

## Issue

The issue is whether the board erred in holding that Bey had not established diligence based on his attorney's work on related applications during the 41–day critical period from before June 1, 1977, to July 11, 1977.

## Background

### A. Interference Proceedings

Kollonitsch's patent application has the effective filing date of June 1, 1977. Bey's patent application has the effective filing date of July 11, 1977. The interference

count is for certain irreversible enzyme inhibitors (for pharmaceutical use), including the monofluoromethyl derivatives of ornithine, lysine, and arginine.[1] Bey presented testimony[2] and exhibits in support of his claim to priority; Kollonitsch chose to rely solely on his filing date.

Bey made two arguments before the board. First, he argued that Kollonitsch was not entitled to make his claim correspond to the interference count because Kollonitsch's application did not sufficiently disclose the utility of the invention under 35 U.S.C. §§ 101, 112. Second, Bey argued that he was entitled to priority because he had prior conception of the invention coupled with reasonable diligence in reducing it to practice. The board held against Bey on both issues, and Bey appealed both issues to this court. We hold that Bey was entitled to priority on the basis of prior conception coupled with diligence; thus, we need not reach the issue whether Kollonitsch's application made a sufficient disclosure.

### B. *Bey's Conception and Diligence*

The board set forth the following standard for priority which Bey had to establish:[3]

In order to prevail in this interference, Bey must establish by a preponderance of the evidence a conception of the invention defined by the count prior to June 1, 1977, the effective filing date of Kollonitsch, coupled with diligence from just

prior to that date up to July 11, 1977, the filing date of his parent application. * * *

The board found that Bey satisfied the first part of the test for priority because he established conception of the invention by at least March 10, 1977, prior to the effective filing date relied upon by Kollonitsch.

Bey claimed constructive reduction to practice, based on the filing of his patent application, on July 11, 1977. Thus, Bey had to show that he was reasonably diligent during the 41–day continuous critical period from May 31, 1977, a date just prior to the June 1, 1977, filing date of Kollonitsch's parent application, to July 11, 1977, the filing date of Bey's parent application.

Bey's case for diligence hinged on whether his patent attorney, Ruth Hattan (Hattan), had been reasonably diligent in preparing and filing the patent application during the 41–day critical period. During the critical period, Hattan worked on a group of 22 patent applications relating to irreversible enzyme inhibitors, including the parent to the present application. Bey argued to the board that Hattan's work on the closely related applications contributed substantially to the preparation of the present application. Thus, Bey argued that work on the related applications should be considered in determining whether Bey was reasonably diligent in filing the present application.[4]

The irreversible enzyme inhibitors were invented by a small group of researchers at Richardson-Merrell, Inc., in Strasbourg, France. Bey presented unrebutted evi-

1. The interference count is defined as follows:

"A compound of the formula

Z–C–COR
|
NH$_2$

wherein

Z is gamma-guanidinopropyl or H$_2$N(CH$_2$)$_n$–

wherein n is 3 or 4;

Y is FCH$_2$– or ClCH$_2$–;

R is hydroxy or or (C$_1$–C$_{18}$) alkoxy;

and the pharmaceutically acceptable salts and individual optical isomers thereof."

2. This testimony was adduced by Bey in prior Interference Nos. 99,934, 100,008, 100,010, and 100,340, which interferences are not at issue in this appeal.

3. Citing *Gould v. Schawlow,* 363 F.2d 908, 150 USPQ 634 (CCPA 1966). *See Paulik v. Rizkalla,* 760 F.2d 1270, 226 USPQ 224 (Fed.Cir.1985).

4. *See Rines v. Morgan,* 250 F.2d 365, 369, 116 USPQ 145, 148 (CCPA 1957); *Rey-Bellet v. Engelhardt,* 493 F.2d 1380, 1388, 181 USPQ 453, 458 (CCPA 1974).

dence that the irreversible enzyme inhibitors are interrelated in their chemistry, structure, and utility because they are similar derivatives of amino acids.

The supervisor of Richardson-Merrell's patent law department in Cincinnati, Ohio, selected Ruth Hattan, an experienced pharmaceutical patent attorney, to prepare the resulting patent applications. The supervisor testified that he chose to have one attorney handle the applications because of the closely related technology, the small number of inventors, and the required travel to the Strasbourg, France, location.

Hattan went to Strasbourg in January 1976, to obtain the necessary disclosure from the inventors. She returned to the United States and she subsequently prepared 22 patent applications, listing only four inventors with considerable overlap of inventorship.

A status report dated May 31, 1977, at the beginning of the critical period, showed that the 22 applications were in various stages of completion with expected filing dates between June 15 and August 15, 1977. Bey presented evidence that Hattan worked on the applications from this group on almost every working date in the critical period. There was no evidence that priority was given to any applications docketed after the group of 22 applications. Hattan traveled to Strasbourg again on June 25, 1977, for a conference with the inventors. In Strasbourg, she completed 16 of the patent applications, including the parent to the present application, and she mailed them from Strasbourg directly to the PTO, resulting in the filing date of July 11, 1977, for the present application.

In the present interference decision, the board found that Bey had failed to show diligence because Hattan had not documented sufficient specific activity on the present application, and Hattan could not show that the applications were taken up in

chronological order. The board rejected Bey's argument that work on the related applications should be considered as diligence with respect to the present application. The board found that Bey failed to show that the irreversible enzyme inhibitor applications were sufficiently related, notwithstanding the unrebutted, corroborated evidence of the relationships between the applications. Thus, the board found that Bey had not exercised reasonable diligence, holding that Bey could not rely on his attorney's work on the other applications involving irreversible enzyme inhibitors.

The board noted that its decision was consistent with its decision in a previous interference between the same parties, where the board considered the same testimony and found that these applications were not sufficiently related.[5] Bey did not appeal from the previous interference decision, and we do not rule on that decision here. We note that neither the board nor the parties treated the previous decision on the "related case" issue as binding in the present case. Therefore, we must review the board's present decision for errors of law or clearly erroneous findings of fact on the basis of the record now before us.[6]

### Attorney Diligence

### A. Work on the Application in Question

■ Clearly, reasonable diligence can be shown if it is established that the attorney worked reasonably hard on the particular application in question during the continuous critical period.[7] With respect to the Bey application in this interference, it was established only that the application was "to be typed" as of May 31, 1977, and that the application was mailed to the PTO from Strasbourg on July 5, 1977. Bey argued that the 40–45 page application had to be typed, revised, proofread and/or finalized, mailed to the inventors in France for final review, and the formal documents signed and mailed to the PTO. Bey admitted,

5. *Bey v. Kollonitsch,* 215 USPQ 454 (Bd.Pat.Int. 1981) (Interference No. 99,934).

6. *In re Caveney,* 761 F.2d 671, 674, 226 USPQ 1, 3 (Fed.Cir.1985).

7. *Rines,* 250 F.2d at 369, 116 USPQ at 148; *Gould,* 363 F.2d at 911, 150 USPQ at 637.

however, that Hattan's records did not show the exact days when activity specific to *this* application occurred. Thus, we cannot say that the board clearly erred in finding that "the documented activities with regard to [the present application] are insufficient by themselves to prove diligence."

### B. *Work on Applications in Chronological Order*

Of course, it may not be possible for a patent attorney to begin working on an application at the moment the inventor makes the disclosure, because the attorney may already have a backlog of other cases demanding his attention. Thus, the courts have recognized that *reasonable* diligence is all that is required of the attorney:[8]

> [I]t is not necessary that an inventor or his attorney should drop all other work and concentrate on the particular invention involved; and if the attorney has a reasonable backlog of work which he takes up in chronological order and carries out expeditiously, that is sufficient.

 Generally, the patent attorney must show that unrelated cases are taken up in chronological order, thus, the attorney has the burden of keeping good records of the dates when cases are docketed as well as the dates when specific work is done on the applications.[9]

In the present case, Hattan did not assign docket numbers to the cases in consecutive order, and she could not state the specific dates when the cases were docketed. Thus, the board was correct in finding that Bey failed to show that the cases were taken up in chronological order.

### C. *Work on Related Cases*

Frequently, an inventor or group of inventors may file more than one patent application involving closely related subject matter. In this type of situation, the "exact lines of demarcation between the cases [may not be] clear in all respects at the start."[10]

In *Ginos v. Nedelec*,[11] Ginos worked during a period of 150 days on the development of several pharmaceutical compounds closely related in structure and utility. The board treated the compounds as one "generic invention," and it credited Ginos' work on the closely related compounds as diligence with respect to the particular compound claimed in the application in question.

In *Ginos*, the several compounds originally were claimed in one "grandparent" application, which was subsequently divided into several applications claiming individual compounds. Presumably, the same finding of diligence would obtain if Ginos had originally filed a separate application for each compound, instead of one grandparent application.

Treating a generic invention and the resulting group of related applications as a whole, there may be significant overall savings in time and expense by having one attorney prepare the applications together as a group. In Bey's case, Hattan and her supervisor testified that the applications were assigned to one attorney because of the interrelationships in chemistry, structure, utility, and inventorship, as well as the distance between the patent law department in Cincinnati, Ohio, and the inventors' location in Strasbourg, France. Hattan's supervisor testified that "while in theory [the applications] could have been distributed amongst several patent attorneys, in practice it would mean duplication of work unnecessarily and, ultimately, delay in preparation of the cases."

---

8. *Rines,* 250 F.2d at 369, 116 USPQ at 148.

9. Of course, the question of diligence is subject to the "rule of reason" as determined in the particular circumstances of each case. *See D'Amico v. Koike,* 347 F.2d 867, 871, 146 USPQ 132, 135 (CCPA 1965); *Gould,* 363 F.2d at 921, 150 USPQ at 645.

10. *Rines,* 250 F.2d at 369, 116 USPQ at 148.

11. *Ginos v. Nedelec,* 220 USPQ 831, 835–36 (Bd. Pat.Int.1983).

■ In priority determinations, the inventor should not be penalized because his attorney reasonably prepared the closely related applications together, thereby *expediting* the filing of the applications and the prompt disclosure to the public of the closely related inventions contained therein.

■ The question is under what circumstances may work on a related case be credited as diligence with respect to the instant application. We hold that work on the related case is to be credited toward reasonable diligence if the work on the related case "contribute[s] substantially to the ultimate preparation of the involved application."[12]

Here, it appears that the board failed to apply the correct rule of law in determining whether Hattan's work on the related applications constituted diligence with respect to the present application. The board erroneously required Bey "to show that all the cases in the alleged 'package' were docketed at the same time" and to show that none of the related applications was filed before the present application. Here, the board seems to have blurred the test for related cases with the requirement that *unrelated* cases must be taken up in chronological order.

Hattan's unrebutted testimony, as corroborated by documentary evidence and by her supervisor's testimony, clearly shows that she took up the applications simultaneously as a group, well before the start of the critical period, and that the applications were filed within a few days of each other. This evidence would appear to support, rather than to negate, the applicability of the related cases doctrine.

■ The board also erred in requiring Bey to show that the cases "*had* to be worked on as an integrated whole" (emphasis supplied). The board stated that "[t]he sheer number of cases involved makes it even more difficult to ascribe any unifying characteristics to the group as a whole." While there are a large number of cases involved, the number alone is not determi-

native as to whether the cases were sufficiently related.

The board's finding, that Bey failed to show that the cases were worked on as a group, is clearly erroneous on the basis of this record. Hattan testified that she worked on the "whole enzyme inhibitor series of cases * * * simultaneously as a package." She explained the relationships between the applications as follows:

They're related in their basic mechanism of action. The whole enzyme inhibitor area is based on irreversible inhibition of various enzymes, and the utility form in various of these cases is the same. The chemistry involved in preparing many of these cases is the same across the board, with just a change of starting material. The inventorship is not the same on every case but there are common inventors involved on all of these cases, but the chemistry and utility are very closely interrelated in these cases.

Hattan continued her testimony in greater detail concerning the relationships in technology, utility, and inventorship:

The relationships are many. All of the compounds involved in that series of patent applications operate through the same basic mechanism of action; that is, irreversible inhibition of enzymes.

The series of compounds involved also are related structurally, the basic structure being that of the natural occurring amino acids with the compound including derivatives thereof, and all involve substitution at the alpha position of the amino acids or derivatives thereof with various functional groups.

Within any one group of amino acids the cases are further related insofar as utility is concerned that, for example, many of the cases have the same utility, the difference between cases having the same utility being generally the nature of the substituent at the alpha position, which also involves different chemical procedure for obtaining those compounds

12. *Rines,* 250 F.2d at 369, 116 USPQ at 148.

as the nature of the substituent at the alpha position varies within any one group of compounds involving the same amino acid, the only difference being within that series of compounds the nature of the substituent at the alpha position.

There is a cross-over from case to case of utility, and in preparing one application, for example, just to illustrate, in the preparation of Case—I believe the case number is MI–906, which is directed to alpha acetylenic and alpha vanillin histidine decarboxylase inhibitors and related compounds.

The utility statements in that application are essentially identical to those in Case MI–884, and *in many instances in preparing the patent applications it was possible to take out large segments of one application and use it in the preparation of another application with very minor modifications.* [Emphasis supplied.]

The patent applications are also interrelated on the basis of chemistry in many instances, and also on inventorship, there being a common inventor—namely, Dr. Jung—on all of the applications, the other inventors being Dr. Metcalf and Dr. Bey, and on two of the applications I believe Dr. Casara is also an inventor.

It is clear from Hattan's unrebutted testimony that the applications were treated as a group because of the closely related technology, even to the extent that the applications contained a common set of information:

The package was worked on as a group. All of these cases were treated as a group and worked on at the same time because there was such a common set of information that could be transferred from one case to another; and the reason they were worked on together as a package was to expedite the filing of the cases. By transferring information from case to case, it made the preparation much faster and the filing.

■ Hattan's testimony was corroborated by documentary evidence, including abstracts of the patent applications, as well as by the testimony of her supervisor. It does not appear that Bey introduced into evidence the 22 complete patent applications; however, Bey introduced sufficient evidence to establish a prima facie case that the applications were closely related, and Kollonitsch failed to introduce any evidence in rebuttal. The board itself acknowledged that all of the applications relied upon by Bey involved "irreversible enzyme inhibitors." On this record, the board clearly erred in finding that the applications were not related. We hold that Hattan's work on the related cases must be credited toward reasonable diligence on the instant application, because Bey established that work on the related cases "contributed substantially to the ultimate preparation of the involved application." [13]

■ The record of Hattan's work on the related cases during the 41–day critical period contains unrebutted evidence of reasonable diligence. There is corroborated evidence of specific work performed on the related applications on almost every working day in the critical period to support Hattan's testimony that she worked continuously on the applications during this period. The record shows that *16 related patent applications,* including the instant application (each containing 40–50 typewritten pages), were written, revised, proofread and/or finalized, mailed to the inventors in France for final review, and executed and mailed from Strasbourg by July 5, 1977. The PTO received the parent to the present application on July 11, 1977, the last day of the critical period. On this record of unrebutted, corroborated evidence, we hold that Bey established reasonable diligence during the continuous 41–day critical period, and that the board's finding to the contrary was clearly erroneous.

### Conclusion

Bey, having established prior conception coupled with reasonable diligence for the

13. *Id.*

continuous critical period, was entitled to priority. The board's decision, awarding priority to Kollonitsch, is reversed.

REVERSED.