Opinion for the court filed by Circuit Judge DYK.
Dissenting opinion filed by Circuit Judge O’MALLEY.
DYK, Circuit Judge.
Enhanced Security Research, LLC (“ESR”) appeals from the decision of the Board of Patent Appeals and Interferences (“Board”), now the Patent Trial and Appeal Board, in an ex parte reexamination of U.S. Patent No. 6,119,236 (“the '236 patent”). The Board affirmed the Patent and Trademark Office (“PTO”) examiner’s rejection of claims 1-5 and 7-19 as obvious. We affirm.
Background
The '236 patent, as amended, claims a computer security device and method for preventing unauthorized individuals from gaining access to a local computer network. The patent specification describes an “intelligent network security device” (“INSD”) that is capable of balancing the desire for network security against the need for network accessibility. '236 patent col. 3 1. 47. The INSD protects a local network by: (1) monitoring the data packets flowing into and out of the network in order to detect suspicious patterns of communications; (2) assigning weighted values to any threatening activity it detects; and (3) blocking communications based on their assigned weight using a firewall.
Claim 1 of the amended '236 patent reads:
In a computer system connected to an external communications medium, a security device comprising:
a programmable firewall device interposed between the computer system and the external communications medium;
a controller device configured within the computer system such that said controller device can access all communications into and out of the computer system; and
a communications device for communicating instructions from said controller device to said firewall device for controlling said firewall device; wherein
said controller device is configured to operate generally continuously and repeatedly to:
(i) examine, in essentially real time, communications incoming to the computer system;
(ii) analyze, in essentially real time, communications to detect if the communications contain patterns of activity indicative of an attempted security breach;
(iii) assign a weight to the attempted security breach if an attempted security breach is detected; and
(iv) continuously control the firewall during the operation of the computer system to block communications between the computer system and the external communications medium, based on the weight assigned to the attempted security breach, when an attempted security breach is detected.
JA 9622-23. Thus; claim 1 pertains to a security device that provides protection to a local area network (“LAN”) by monitoring communications, analyzing whether they represent attempted security breaches, assigning weights to any detected breach attempts, and, finally, commanding the firewall to block attempted breaches based on their assigned weight.
Claims 2-5 and 7-11 are dependent on claim l.[1] Amended claims 8 and 9 relate to the blocking process. Claim 8 states:
*1350 the controller controls the firewall to block the communication between the computer system and the external communication medium for a predetermined, period according to the weight assigned to the attempted security breach.
Id. claim 8 (emphasis added). Claim 9 presents a slight variation on claim 8: after the controller assigns a weight to the attempted breach, “the controller controls the firewall to block communications between a selected portion of the computer system and the external communications medium according to the weight assigned to the perceived attempted security breach.” Id. claim 9 (emphasis added). Thus, under these dependent claims, the INSD has limited blocking capabilities: the INSD can only command the firewall to undertake a certain, predetermined response.
Next, independent claim 12 covers the method portion of the '236 patent. According to amended claim 12, this method comprises
monitoring, in essentially real time, communications between the local area network and the wide area network;
determining, over time, if the communications between the local area network and the wide area network contain patterns of activity indicative of an attempted security breach;
classifying 'by assigning a weight to the attempted security breach if an attempted security breach is detected; and
generally simultaneously controlling a firewall to selectively block communications between the local area network and the wide area network depending upon the weighted classification assigned to the attempted security breach.
Id. claim 12. Under some of the dependent claims, the method entails classifying and assigning a weight to an attempted security breach depending on: (1) “the importance of a portion of the local area network which the attempted security breach attempts to access,” id. claim 15 (emphasis added); (2) “the number of attempts made in the course of the attempted security breach,” id. claim 16 (emphasis added); or (3) “the relative sophistication of the attempted security breach,” id. claim 17 (emphasis added).
A third party requested reexamination of the original patent, and, among other documents, two potential pieces of prior art were before the PTO: the manual of a software product called NetStalker (“Net-Stalker” or the “Manual”) and a scholarly article authored by G.E. Liepins and H.S. Yaccaro (“Liepins”). Similar to the '236 patent, the NetStalker software protects a LAN from attempted security breaches. The Manual describes how the product functions and teaches the user how to install the software and tailor it to his needs. Through these descriptions, the Manual discloses a dynamic security device that provides protection to a LAN by monitoring the incoming and outgoing communications, identifying attempted security breaches, and then automatically blocking any unauthorized access attempts. As discussed below, ESR contends that the Manual is not prior art.
Liepins is a scholarly article that describes a computer system, called Wisdom and Sense (“W & S”), that is capable of detecting anomalous network activity. *1351 Liepins first recognizes that the identification of activity patterns not previously known to be associated with misuse is intrinsically difficult to systematize. Lie-pins also notes that “just checking” historical data regarding misuse patterns is not sufficient. To solve this problem, Liepins teaches a framework that can detect newly identified anomalous activity by automatically generating, weighing, and applying a “forest” of decision rules. Using stored data to identify patterns associated with unauthorized access, W & S generates rules that are capable of parsing new anomalous activity from acceptable activity.[2] Through this mechanism, the W & S system protects a LAN without shutting down all network activity. ESR does not dispute the prior art status of Liepins.
During reexamination, the examiner rejected claims 1-19 as obvious in light of various prior art references. The examiner also rejected ESR’s arguments that the Manual did not qualify as publically-available prior art. The applicant then amended the '236 patent claims and appealed to the Board.[3] The Board affirmed the rejection of amended claims 1-5 and 7-19.
ESR timely appealed to this court, and we have jurisdiction pursuant to 28 U.S.C. § 1295(a)(4)(A). We review the Board’s legal determinations de novo, and its factual findings for substantial evidence. In re Baxter Int’l, Inc., 678 F.3d 1357, 1361 (Fed.Cir.2012).
Discussion
I. Obviousness
A determination of obviousness under 35 U.S.C. § 103 is a question of law based on underlying findings of fact. Graham v. John Deere Co., 383 U.S. 1, 17-18, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966); In re Baxter, 678 F.3d at 1361. The differences between the claimed invention and the pri- or art as well as what a reference actually teaches are questions of fact. In re Baxter, 678 F.3d at 1361; Rapoport v. Dement, 254 F.3d 1053,1060-61 (Fed.Cir.2001).
With respect to obviousness, the critical issue is whether the Manual in combination with Liepins teaches a person of ordinary skill in the art how to assess the severity of an attempted security *1352 breach and then block that attempted breach based on its severity. (For the purposes of this discussion, we assume that the Manual constitutes valid prior art. This assumption is discussed in Section II.)
As previously described, the amended '236 patent claims a device that examines the data entering and exiting a LAN, assigns weights to any attempted security breaches, and initiates predetermined responses depending on the assigned weights of the attempted breaches. ESR argues that a combination of NetStalker and Liepins does not disclose: (1) assigning a weight to an attempted security breach; or (2) blocking incoming communications based on that assigned weight. The Board found that, in combination, these two pieces of prior art disclosed all of the elements of the '236 patent. Substantial evidence supports this conclusion.
NetStalker teaches: (1) assigning severity levels to network transactions or events based on the number of attempted intrusions; [4] (2) automatically blocking the source of communications when those transactions meet user-defined criteria; and (3) varying response type based on the number of breach attempts. More specifically, the software employs a system of filters to detect attempted security breaches, referred to in the Manual as “misuse.” The NetStalker filters correspond to various activities that are associated with security breaches. The software then uses a program known as the “Misuse Detector” to “combine[ ] series of filters to ‘sieve’ the [network] data.” JA 312. “Each filter reduces the total number of events sent to the next filter,” and “[t]he result is a set of all events that match the specified filters.” JA 312. If the number of events meets a specified threshold, the NetStalker software triggers an alarm. After a user has defined the filters and configured the Misuse Detector, he can “select one or more alarms and [] assign the parameters for triggering the alarm.” JA 325. One of the alarm options available to the user is “Shun,” which automatically blocks the unwanted communication.
Although the NetStalker software was sold with a default set of filters, the product permits users to create custom filters according to their specific security needs. The filters can monitor a variety of parameters and can be turned on or off at the discretion of the user. The NetStalker software also enables its users to configure the Misuse Detector, “to create custom detection configurations.” JA 312. In other words, the software allows users to define what types of events (for example, an attempted login for a particular source) will count for the purposes of triggering an alarm.[5] The user can program the software such that it recognizes the number of intrusions of a particular type as more “severe” than others. Therefore, the Net-Stalker software teaches responding to attempted breaches based on user-defined criteria, ie., creating a causal connection between the user-defined parameters and the subsequent alarm response, including the “Shun” response.[6]
*1353 What the Manual does not disclose is the automatic assignment of different weights to different types of attempted security breaches. Liepins fills this gap with its systematic rule-based framework that is capable of automatically identifying exceptional network activity. As previously discussed, the W & S system automatically generates rules wherein activity that is indicative of an attempted breach is more likely to fail a particular rule. Each rule is assigned a weight such that “the strengths ... reflect the confidence that the rules flag transactions that should be flagged, and don’t flag those that shouldn’t.” JA 402. If a transaction fails a particular rule, that failure will be assessed in combination with the strength of the particular rule it failed. Thus, whether the W & S system will flag a transaction as anomalous depends on whether that transaction passed or failed a rule as well as the weight of the rule itself.
The patent claims here assign weights to attempted security breaches based on factors such as: (1) “the importance of a portion of the local area network which the attempted security breach attempts to access,” Amended '236 patent claim 15 (emphasis added); (2) “the number of attempts made in the course of the attempted security breach,” id. claim 16 (emphasis added); and (3) “the relative sophistication of the attempted security breach.” Id. claim 17 (emphasis added). Liepins similarly discloses a system of assessing how threatening a particular network event is based on a system of weighted rules. Nothing in the amended '236 patent claims suggests that ESR’s method of assigning weights is any more sophisticated than that of Liepins. The broad language of claim 12 and its dependent claims fails to specify any teachings that would be nonobvious in light of the combination of the Manual and Liepins.
Finally, ESR argues that the Board “failed to address the limitations contained in dependent claims 9, 15, and 17.” Appellant’s Br. at 47. As the PTO points out on appeal, ESR waived this argument when it failed to separately argue these claims. As this court explained in In re Lovin, 652 F.3d 1349 (Fed.Cir.2011), the Board may reasonably interpret 37 C.F.R § 41.37, the rule governing the briefing requirements in ex parte appeals, “to require applicants to articulate more substantive arguments if they wish for individual claims to be treated separately.” Id. at 1356. ESR asserts that it separately argued claims 9, 15, and 17 when it quoted the claims in its appeal brief and stated that these limitations did not appear in the prior art. Lovin specifically held that this type of argument was insufficient, stating that “a mere recitation of the claim elements and a naked assertion that the corresponding elements were not found in the prior art” is insufficient under Rule 41.37. Id. at 1357.
Here, ESR did not argue the dependent claims under separate subheadings as Rule 41.37 (2012)[7] required. Instead, ESR grouped the dependent claims with their independent claims. ESR only referenced *1354 dependent claims 9,15, and 17 as examples of “additional limitations which are neither taught nor suggested by [the prior art].” JA 9615; see also JA 9616. The Board found that ESR did not provide sufficient additional arguments in support of the dependent claims. Under Lovin, we conclude that the Board has not erred in using its discretion to interpret Rule 41.37 to require ESR to provide distinct substantive grounds if it wished to obtain separate consideration of claims 9, 15, and 17 by the Board. Thus, we hold that ESR has waived its arguments with respect to these claims.
In short, the features of the amended '236 patent claims were disclosed by the combination of the Manual and Liepins. ESR does not contest that a person of ordinary skill in the art would have been motivated to combine Liepins and Net-Stalker. Graham also instructs courts to consider the secondary indicia of non-obviousness, such as “commercial success, long felt but unsolved needs, failure of others, etc.” Graham, 383 U.S. at 17, 86 S.Ct. 684. However, ESR does not reference any secondary considerations. We therefore conclude that the Board did not err in finding the claims obvious.
II. The NetStalker Manual as Prior Art
We have so far proceeded on the assumption that NetStalker constitutes a valid prior art reference. However, ESR contends that the Board erred in treating the Manual as prior art. Whether a document qualifies as a “printed publication” that is “available to the public” for the purposes of 35 U.S.C. § 102(a)(1) is a question of law based on underlying findings of fact. See In re Hall, 781 F.2d 897, 899 (Fed.Cir.1986). Under 35 U.S.C. § 102(a)(1), prior art encompasses any matter that “was patented, described in a printed publication, or in public use, on sale, or otherwise available to the public before the effective filing date of the claimed invention.” This court has interpreted § 102 broadly, explaining that even relatively obscure documents qualify as ■prior art so long as the public has a means of accessing them. See, e.g., Hall, 781 F.2d at 899.
Our leading case on public accessibility is In re Hall, 781 F.2d 897 (Fed.Cir.1986). In Hall we concluded that “a single cataloged thesis in one university library” constitutes “sufficient accessibility to those interested in the art exercising reasonable diligence.” Id. at 900. Thereafter, in Constant v. Advanced Micro-Devices, Inc., we explained that “[accessibility goes to the issue of whether interested members of the relevant public could obtain the information if they wanted to.” 848 F.2d 1560, 1569 (Fed.Cir.1988). Therefore, “[i]f accessibility is proved, there is no requirement to show that particular members of the public actually received the information.” Id.
In this case, the title page of the Manual contains an inscription dating it to May 1996. ESR, however, challenges the Manual’s claimed date of priority, arguing that the version of the Manual that the examiner relied on may not have been available in May 1996 and that there are indications that this version was a draft rather than a final document available to the public. However, Stephen Smaha, the Chief Executive Officer of the company that produces the NetStalker software, filed a declaration (“Smaha Declaration”) with the PTO averring that the version of the Manual before the examiner was available in May 1996. Smaha explained that “[m]embers of the public showing an interest in buying or licensing the NetStalker product could have obtained a copy of the manual by contacting Haystack or Network Systems Corporation and requesting one,” and, indeed, “[t]he NetStalker product was sold to or installed for approximately a dozen *1355 customers.” JA 9705 (footnote omitted). In view of the Manual’s inscription date, the Smaha Declaration, and evidence of NetStalker advertisements published in 1995, we conclude that substantial evidence supports the Board’s finding that the Manual constituted publically-available prior art under § 102(a)(1).
ESR also argues that the Manual should not be considered in the circumstances of this case because it was missing pages. To support this proposition, ESR relies on Panduit Corp. v. Dennison Manufacturing Co., wherein this court explained that prior art “must be considered in its entirety, ie., as a whole, including portions that would lead away from the invention in suit.” 810 F.2d 1561, 1568 (Fed.Cir.1987). ESR contends that because the Manual was missing pages, it “cannot be considered as a whole” and therefore “should not be considered at all.” Appellant’s Br. at 26.
Panduit did not involve a situation similar to the missing pages at issue here. In Panduit, we reversed a district court’s determination that a patent was obvious in light of the prior art. Panduit, 810 F.2d at 1565. We explained that this reversal was necessary because the district court “treated no claim, nor the entire prior art, nor any prior patent ‘as a whole,’ but [instead] selected bits and pieces from pri- or patents that might be modified to fit its legally incorrect interpretation of each claim as consisting of one word.” Panduit, 810 F.2d at 1587. Thus, Panduit explains that § 103 does not permit a court to stitch together an obviousness finding from discrete portions of prior art references without considering the references as a whole. That is not what occurred here.
In addition to Panduit, ESR urges that the Manual of Patent Examining Procedures (“MPEP”) supports its argument. To the contrary, the MPEP contemplates partial submissions of prior art documents. The primary regulation governing reexamination, 37 C.F.R. § 1.510, permits parties to submit partial prior art references: under § 1.510(b)(3), a requester is only required to submit the “pertinent parts” of any non-English translation. Commenting on § 1.510(b)(3), § 2214 of the MPEP explains that § 1.510(b)(3) requires the requester to submit “a translation of each non-English document (or a translation of at least the portion(s) relied upon).” Similarly, § 2218 of the MPEP, the very section of the MPEP that ESR argues supports its argument, only requires the submission of the “pertinent parts” of a non-English translation.
Section 1.105 of the PTO regulations permits an examiner to request more information from a patentee[8] in the course of reexamination if such information is necessary “to properly examine or treat the matter.” 37 C.F.R. § 1.105. With respect to such requests, the MPEP explains that “where the document is á bound text or a single article over 50 pages, the requirement may be met by providing copies of those pages that provide the particular subject matter indicated in the requirement, or where such subject matter is not indicated, the subject matter found in applicant’s disclosure.” MPEP § 704.14(a) ¶ 7.122. The version of the Manual that the Board relied on is over sixty pages long and appears to fall within this provi *1356 sion. We conclude that the PTO’s own rules permit the consideration of selected portions of prior art references so long as the missing portions are not necessary to fully understand the submitted portions. ESR cites no authority for the proposition that the PTO is categorically precluded from considering a reference if it is incomplete. Indeed, ESR agrees that partial documents can be considered “[if] there is clear evidence the missing pages would not impact those that are available.” Appellant’s Br. at 26.
We agree that missing pages may sometimes be necessary for understanding a prior art reference. But nothing in the Manual here suggests that the missing pages were necessary to an understanding of the pertinent parts of the reference. The Manual’s table of contents as well as its page numbering suggest that it was missing three additional pages in chapter five and seven pages in chapter seven. Titled “Running NetStalker,” chapter five describes “the steps required to use the pre-defined configurations that are shipped with NetStalker and to start the NetStalker processes.” JA 307. The available pages teach how to determine the type of alarm the NetStalker security system triggers and the alarm parameters. One of the alarm type is “Shun,” which automatically block unwanted communications. The table of contents and the list of figures indicate that the missing pages contained an explanation of what a user should do before running the NetStalker software, how to select a “scenario,”[9] how to configure alarm overrides, and how to run the software.[10] Nothing in the table of contents or the available chapter five pages suggests that the missing content contradicts the available portions of chapter five on which the PTO relied or other parts of the Manual.
Chapter seven describes “how to manage and analyze historical router event data,” JA 329, the log of communications that have entered and exited the local network.[11] This chapter details the NetStalker software’s ability to save all router events and establish a “hierarchy of locations” for storing them. JA 330. Although ESR’s security device must also manage historical data, the limitations of the amended '236 patent claims do not address the management of historical data.[12] Therefore, this chapter does not *1357 appear to be significant to the amended '236 patent claims.[13]
ESR claims that the missing sections were necessary because they could: “(1) clarify the often cryptic disclosure in the NetStalker Manual and thus alter its meaning; or (2) disparage or teach away from application of the relied upon teachings to the '236 invention.” Appellant’s Br. at 29. However, ESR fails to point to anything in the Manual that might support this conclusion. When the panel pressed ESR at oral argument to explain how the missing pages might plausibly teach away from the '236 invention, ESR postulated that the missing pages “could have disparaged the use of a user-defined security level to trigger an alarm.” See Oral Argument at 6:36, available at http://www.cafc. uscourts.gov/oral-argument-recordings/13-1114/all. This scenario is both speculative and highly implausible: a manual would not tell users how they can utilize the product in a particular way, only to then tell them- not to do so. As the examiner explained, “[w]hen the source is reviewed as a whole, there is no evidence whatsoever that the missing pages detract in any way from the NetStalker manual’s disclosures and teachings.” JA 9157.[14] The Board reached a similar conclusion, and we agree.
III. Diligence
Finally, ESR argues that even if the '236 patent would have been obvious in light of NetStalker and Liepins, NetStalker should not be considered invalidating prior art because ESR conceived of the invention before the publication of the NetStalker Manual, and was diligent in reducing it to practice. The Manual con *1358 tains an inscription that dates it to May-1996, and the '236 patent is a continuation in part of an application filed on October 7, 1996. Even if ESR had established a conception date before May 1996 (earlier than the publication date of the Manual), we find no error in the Board’s decision that there was no showing of diligence in reducing the invention to practice.
Under 37 C.F.R. § 1.131, a party may file an oath or declaration establishing that the invention described in his rejected claims predates the reference on which the rejection was based. Under § 1.131, the party may remove his invention from the purview of the prior art reference by providing facts “in character and weight” that demonstrate “conception of the invention prior to the effective date of the reference coupled with due diligence.” 37 C.F.R. § 1.131(b) (2012).[15] A party may prove due diligence by showing his attorney’s efforts to achieve a constructive reduction to practice. Bey v. Kollonitsch, 806 F.2d 1024, 1026 (Fed.Cir.1986).
In order to establish attorney diligence, ESR submitted declarations from Peter M. Shipley, the inventor of the '236 patent (“Shipley Declaration”), and F. Eric Saunders, the attorney who filed the '236 patent application (“Saunders Declaration”). In their declarations, Saunders and Ship-ley described meetings and telephone calls that took place from February 28, 1996 (when Shipley and Saunders first met in person) to October 7, 1996 (when the patent application of which the '236 patent is a continuation was filed). ESR argues that these declarations demonstrate the requisite attorney diligence during the critical period.
The Board disagreed and found that ESR failed to show that Saunders “ ‘worked diligently and continuously’ over the four month period preceding the filing date of October 7, 1996.” JA 14. In making that determination, the Board relied on Bey, where this court examined the standard for attorney diligence in a patent interference case. In Bey, we explained that “reasonable diligence can be shown if it is established that the attorney worked reasonably hard on the particular application in question during the continuous critical period.” 806 F.2d at 1027. We emphasized that the attorney’s records should “show the exact days when activity specific to [the patentee’s] application occurred.” Id. at 1028.[16]
In this case, the critical period in which ESR must demonstrate diligence spans from May 1996, when the relevant version of the Manual became available, to October 7, 1996, when Saunders filed Shipley’s patent application. The record reveals that over the course of five months, Saunders had a few conversations with Shipley, conducted a prior art search, billed for under 30 hours of work, and drafted the patent application. Citing Bey’s emphasis on the importance of supplying specific dates of activity when attempting to establish dili *1359 gence, the Board found that, apart from records showing work on “May 4, 6, and 20, and activity in July,” JA 13, ESR failed to provide “records or other evidence showing the exact days when activity specific to this application occurred.” JA 13. Although § 1.131 did not require Saunders to work on Shipley’s patent application without pause, we hold that substantial evidence supports the Board’s finding that ESR failed to demonstrate the requisite attorney diligence.
Conclusion
In sum, we hold that the examiner and Board properly treated the NetStalker Manual as publically-available prior art and, having done so, correctly concluded that the teachings of the Manual and Lie-pins render the amended '236 patent claims at issue obvious under 35 U.S.C. § 103. We further hold that ESR has failed to demonstrate the requisite attorney diligence under Rule 131, and, therefore, the '236 patent does not predate the publication date of the Manual.
AFFIRMED.

. In claim 2, the computer system is a LAN. In claim 3, the external communications me *1350 dium is the Internet. In claim 4, the LAN is operating as an Ethernet network. In claim 5, the controller device examines communications entering the computer system for "code known to be associated with attempted security breaches.” In claim 7, the communications device is a serial data communications link. In claim 10, "the controller is a general purpose computer,” and in claim 11, the controller and the firewall are "physically distinct computerized units.”

. Liepins explains that
[flor any test field (subject to the pruning conditions and sufficient number of observations) rules are generated with all possible combinations of the other fields in the conditional side. Thus, rules will be formed that predict port on the basis of any combination of user, time-of-day, and day-of-week (individually or in combination); time-of-day on the basis of the other fields; and so forth. In this way, W & S can be thought to extrapolate the available information of what value combinations can be expected to be common and which are unusual: For each field individually, the corresponding tree of the W & S rule forest effectively partitions the space of possible transactions into complementary “rectangular” regions (of arbitrary dimension) that suggest evidence for or against the transaction being an anomaly (conditioned on the available information in the other fields). JA 400. Thus, W & S will detect unwanted communications or activity through this forest of rules that parse the anomalous activity from that which is authorized.

. The applicant amended the '236 patent claims in response to the PTO’s Final Office Action. The examiner allowed the applicant to appeal the amended claims, rather than the claims she had actually rejected, reasoning that
[the] proposed amendments to claims 1, 8, 9, and 12 would place the application in better form for appeal by materially reducing and simplifying the issues for appeal by limiting all the claims to ones requiring (1) assigning a weight or classifying by assigning a weight to an attempted security breach; and (2) blocking based on the assigned weight or weighted classification.
JA 9401.

. The parties agree on this disclosure of the Manual. See Reply Br. at 12 (the Manual "discloses that an alarm is triggered when a count of the number of events meets a threshold”); Resp. Br. at 8 ("The suspicious events are tallied [by the NetStalker software], and when they reach a threshold number an alarm is triggered.”).

. The NetStalker software allows the user to set an alarm that is triggered by the user-defined "severity” of a particular event. This alarm parameter allows a user to define the severity of particular event from 1 to 10.

.The appellant’s brief inaccurately states that "there is simply no disclosure [in the Net-Stalker Manual] that [the] severity rating is used to trigger an alarm, must less cause the software to block communications.” The plain language of the Manual contradicts this statement.
*1353 The dissent also makes the puzzling suggestion that the Board found that “NetStalker and Liepins do not 'specifically teach[ ] using the assigned strength or severity level as a basis for blocking communications.’ ” Dissent at 14 (quoting Appellee’s Br. at 1) (emphasis added). In fact, the Board specifically found that
NetStalker discloses not only a user defined severity level of a security breach but also triggering an alarm when a certain number of (security) events are recognized and blocking communications when the alarm is triggered.
JA 15.

. These provisions have since been amended. See 37 C.F.R § 41.37 (2013).

. 37 C.F.R. § 1.105 permits the examiner to request such information from:
(1) Each inventor named in the application; (2) Each attorney or agent who prepares or prosecutes the application; and (3) Every other person who is substantively involved in the preparation or prosecution of the application and who is associated with the inventor, the applicant, an assignee, or anyone to whom there is an obligation to assign the application.
37 C.F.R. § 1.56(c).

. Chapter one of the NetStalker manual describes a number of possible scenarios involving attempted security breaches. These scenarios include breach attempts from bad hosts, IP spoofing, and false logins, among others. Therefore, the missing page on how to "select a scenario" most likely explains how to configure the software to detect different types of breach attempts.

. The table of contents states that the missing pages are titled: "Running NetStalker,” "Before you run NetStalker,” "To Select a Scenario,” "To Configure Alarm Handler Overrides,” and "To Run NetStalker.” JA 271. The missing figure in chapter five is titled: "Configure Misuse Detector Window.” JA 273.

. The missing pages in chapter seven are titled: "Schedule Log Manager,” "Log Events Record Format & Sample Data,” and "Analyzing Log Files.” JA 272. The five missing figures are: "Schedule Log Manager Window,” "Schedule Crontab Entries window,” Event Data Available Window, "Interactive Alarm Window,” and "NetStalker window.” JA 273-74.

.Instead, claim 5 simply states that "the controller device examines communications incoming to the computer system for code known to be associated with attempted security breaches.” Amended '236 patent claim 5. The specification explains that "in order for the 'look for known patterns' operation to be successful, the INSD might require some knowledge of the configuration of the LAN.... This data can be stored in the memory of the INSD.” '236 patent col. 6 11. 57-61.

. The examiner did cite chapter seven for the proposition that “[a] threshold (factor ... number of attempts) may be applied to a misuse signature, as a second form of analysis that also requires examination of a series of more than one packet.” JA 9896. After stating this proposition, the examiner wrote “See Chapter 7 which describes how to manage and analyze historical (over time) router event data.” JA 9896. This complete quotation reveals that the examiner merely cited chapter seven to show that NetStalker is capable of examining more than one packet. The Board did not rely on chapter seven at all.

. Had the missing pages been necessary to a full understanding of the software, the examiner, of course, could not have relied on the Manual without securing the missing pages. In Star Fruits S.N.C. v. United States, 393 F.3d 1277 (Fed.Cir.2005), we held that the examiner could request further information from the applicant, and 37 C.F.R. § 1.156, see supra note 8, permits requests to others associated with the applicant. However, the relevant regulations do not provide a mechanism through which the PTO may request further information from a third party. This is clear from the history of the America Invents Act's new Third Party Preissuance Submission procedure, codified at 35 U.S.C. § 122(e). The final report of comments from the public notice period for the regulations reveals that commenters were concerned by the inability of examiners to request further information from third party submitters. In response to this concern, the PTO simply stated that
[a]n examiner cannot ... request additional information from a party who makes a third-party submission. The Office does not believe there is a need for a similar mechanism to require further information from third-party submitters as the third parties will be motivated to provide complete submissions that would not likely require further information.
Changes To Implement the Preissuance Submissions by Third Parties Provision of the Leahy-Smith America Invents Act, 77 Fed. Reg. 42,150, 42,161 (July 17, 2012) (to be codified at 37 C.F.R. pt. 1 and 41). Thus, in this case, the examiner could not have requested the missing pages from the third party submitter. This result seems incongruous. While this case does not present an instance in which the missing pages were necessary for examination, in the event that such an instance arises, it would be useful for the PTO to provide a procedure through which an examiner could request further information from the third party requester.

. These provisions have since been amended. See 37 C.F.R. § 1.131 (2013).

. ESR not only argues that the Shipley and Saunders Declarations demonstrate the requisite attorney diligence, but also that the Board applied the wrong standard when assessing the sufficiency of these declarations. ESR contends that the Board applied a "clear and convincing evidence” standard from certain interference cases. See In re Eickmeyer, 602 F.2d 974 (CCPA 1979); Wetmore v. Quick, 536 F.2d 937 (CCPA 1976); In re Moore, 58 C.C.P.A. 1340, 444 F.2d 572 (1971). But the Board did not do so. It never articulated such a standard, and the sole interference case it cited was Bey, which involved a preponderance of the evidence standard because the interference in Bey was between two applications. Bey, 806 F.2d at 1025-26. The Board did not cite interference cases articulating a higher standard of proof for a junior party seeking to antedate — and thus invalidate — a senior party’s issued patent.